IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ASHLEY R. GILLISS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 05-559-SLR |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social | ) |
| Security,[1] | ) |
| | ) |
| Defendant. | ) |

Stephen A. Hampton, Esquire, Dover Delaware.  Counsel for Plaintiff.

David F. Chermol, Esquire, Office of Regional Counsel, Social Security Administration, Philadelphia, Pennsylvania.  Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: March 30, 2007
Wilmington, Delaware

---

[1]On February 12, 2007, Michael J. Astrue replaced Jo Anne B. Barnhart as Commissioner of Social Security.

ROBINSON, Chief Judge

## I. INTRODUCTION

Before the court is an appeal pursuant to 42 U.S.C. § 1383(c)(3) filed by plaintiff, Ashley R. Gilliss, seeking review of the final decision of defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(f). (D.I. 2) Plaintiff has filed a motion for summary judgment asking the court to reverse defendant's decision and award her benefits or, alternatively, remand this matter for a new administrative hearing. (D.I. 12) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm his decision. (D.I. 14) The court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).[2]

## II. PROCEDURAL BACKGROUND

On January 12, 2004, plaintiff filed an application for SSI alleging a disability beginning on December 2, 1992. (D.I. 9 at 13) Plaintiff's application was denied initially and on reconsideration. (Id. at 23-27) She requested a hearing before an administrative

---

[2]Under § 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action may be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g). Likewise, § 1383(c) states that "[t]he final determination of the Commissioner of Social Security after a hearing . . . shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

law judge ("ALJ"). A hearing was held on March 2, 2005 with plaintiff, her mother and a vocational expert testifying before the ALJ. (Id. at 242-285)

On February 22, 2005, the ALJ issued a decision denying plaintiff's claim for SSI. (Id. at 19) The ALJ concluded that plaintiff could perform slow-paced, non-stressful work with no public contact and was not disabled because work existed in significant numbers for individual with these functional limitations. (Id. at 19) The ALJ found that plaintiff had depression, a learning disorder and a personality disorder. More specifically, the ALJ made the following findings:

1. Although [plaintiff] engaged in substantial gainful activity after the alleged onset of disability, this work was an unsuccessful work attempt because of its short duration and because the claimant stopped work due to her impairments.
2. [Plaintiff's] depression, learning disorder and personality disorder are considered "severe" based on the requirements in the [Code of Federal Regulations[3]]   (20 CFR § 416.920(c)).
3. These medically determinable impairments do not, considered singly or in combination, meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
4. The undersigned finds [plaintiff's] allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.
5. [Plaintiff] has the following residual functional capacity: No exertional limitations, but is limited to slow-paced, non-stressful work, with no public contact.
6. [Plaintiff] is unable to perform any of her past relevant work (20 CFR § 416.965).
7. [Plaintiff] is a "younger individual between the ages of 18 and 44" (20 CFR § 416.963).
8. [Plaintiff] has a "high school (or high school equivalent) education" (20 CFR § 416.964).
9. [Plaintiff] has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 416.968).
10. Considering the types of work that [plaintiff] is still functionally capable of performing in combination with [plaintiff's] age, education and work

---

[3]Hereinafter known as "the Regulations."

>   experience, she could be expected to make a vocational adjustment to work that exists in significant numbers in the national economy. Examples of such jobs include work as a housekeeper/officer cleaner (200,000 jobs in the national economy and 500 jobs in the local economy); hand packer (300,000 jobs in the national economy and 800 jobs in the local economy); and cafeteria attendant (100,000 jobs in the national economy and 500 jobs in the local economy).
> 11. [Plaintiff] was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

(D.I. 9 at 19) To that end, the ALJ concluded that the functional limitations, about which plaintiff and her mother testified, were not completely credible when viewed against other evidence of record, especially a report prepared by consultative examining psychologist, Dr. Joseph B. Keyes.[4] (Id. at 14-17) The ALJ likewise found that plaintiff's treating physician's opinion (as expressed in reports and treatment records) was not persuasive because it was "conclusory and does not set forth supportive findings of specific functional limitations." (Id. at 17)

On June 30, 2005, the Appeals Council denied plaintiff's request for review of the ALJ's decision, making it the final decision of the Commissioner of Social Security. (Id. at 5) Plaintiff filed suit in the United States District Court for the District of Delaware within sixty days of receiving the denial, as required by 20 CFR § 422.210(c). (D.I. 2)

## III.  HEARING BEFORE ADMINISTRATIVE LAW JUDGE

### A. Documentary Evidence

---

[4]Specifically, the ALJ determined that "the testimony presented to be not wholly credible, as reported complaints are out of proportion to Dr. Keyes' findings. In addition, although vocational training is recommended, [plaintiff] admitted admitted at the hearing that she has never attempted to contact Vocational Rehabilitation for assistance." (Id. at 17)

In December 1992, the Milford School District conducted a psychological assessment of plaintiff at age seven. (D.I. 9 at 130) According to the school psychologist, Mary S. Stoops,

> [e]ducational screening results for [plaintiff] indicate her academic achievement levels in math computation and reasoning as well as basic reading skills are within the expected range for her ability. However, [plaintiff's] reading comprehension skills are extremely weak and fall below the expected range for her ability. Because of [plaintiff's] apparent difficulty with language expression and comprehension and because she . . . did not talk until [she] was three years of age, a complete language evaluation would appear to be in order for [plaintiff] before final consideration of all information is made.

(Id. at 132) Dr. Stoops concluded that plaintiff's overall performance was "at least Borderline intelligence" and recommended plaintiff's classification and placement as a special education student. (Id. at 132-133) Plaintiff attended Lighthouse Christian Academy from 5th through 12th grade. (Id. at 91)

JoAnn McIllvan, a supervisory teacher at the Lighthouse Christian Academy, submitted a letter on behalf of plaintiff. Ms. McIllvan averred that plaintiff had a learning disability and memory retention problems. (Id.) Specifically, McIllvan recalled that a "definite learning disability was immediately recognized" upon plaintiff's starting at the Lighthouse Christian Academy. In order to help plaintiff, teachers worked closely with her and tried to "teach basic life skills." (Id.) Testing during the 11th grade revealed that some of plaintiff's "academics were below the minimum score for Grade 2." (Id.) McIllvan wrote that plaintiff "graduated vocationally at the 8th grade level- with learning gaps even lower." (Id.)

4

Plaintiff's primary care physician, Robert Wilson, D.O., began treating plaintiff in February 2002 and saw plaintiff in his office seven times between January 12, 2004 and August 3, 2004. (Id. at 194, 164-170) His records indicate that plaintiff presented with depression, insomnia, anxiety and fatigue. (Id. at 164, 169, 170) Dr. Wilson also noted that plaintiff was unhappy at work and had increased anxiety. (Id. at 219) Dr. Wilson prescribed Lexapro, ten milligrams; plaintiff indicated this was helpful. (Id. at 220)

In February 2004, on an insurance claim form, Dr. Wilson described plaintiff's diagnosis as "anxiety, depression, mental delay" with a duration of "lifelong, indefinite." (Id. at 136) On March 5, 2005, Dr. Wilson completed a "Medical Statement on [plaintiff]" and described plaintiff as suffering from depression, insomnia, dermatitis, fatigue, anxiety and mental delay. (Id. at 194) Further, Dr. Wilson wrote,

> [I]t appears that [plaintiff] has some developmental delays including memory impairments and learning disabilities. These have made it very difficult for her to maintain employment.
> As a result of her ongoing depression, fatigue, and learning disabilities, it is my opinion that [plaintiff] is currently not able to sustain a full time job on a regular basis. She will need specialized training, treatment, and assistance if she is to become able to sustain any type of employment.

(Id.)

On April 20, 2004, Joseph B. Keyes, Ph.D., evaluated plaintiff on behalf of the Delaware Disability Determination Service. (Id. at 137) The records reflects, Dr. Keyes' examination was a one-time occurrence. At the time, plaintiff was 19 years old. After testing plaintiff, Dr. Keyes opined:

> [Plaintiff] obtained a Full Scale IQ of 84, indicating cognitive functioning in the borderline to average/normal intellectual functioning range. There is significant difference between verbal-based skill functioning and performance-based skill functioning. Verbal functioning is in the borderline range and performance functioning in the average/normal range. . . .

5

> [Plaintiff] presents with a flat attitude and demeanor. Orientation and memory are average and within normal limits. Mental alertness is somewhat below average/normal. Affect is flat and mood is somewhat sad. Social and inter-personal skills are limited. [Plaintiff] has low self-esteem and feelings of failure and pessimism. She has no friends and social and interpersonal functioning is limited. She is socially withdrawn. Motivation and self-direction are low. She has features of Dependent Personality. . . . The cognitive test finding and personality profile suggest that [plaintiff] would do best in work involving primarily routine/repetitive tasks.
> The Diagnostic Impression is Major Depressive Disorder, Single Episode. Currently, [plaintiff] is receiving medication treatment; Learning Disorder (language-based), mild, NOS and Dependent Personality. [Plaintiff] would benefit from a referral to a psychiatrist for more aggressive medication management, and also from a referral for counseling and therapy. [Plaintiff] is capable of managing her own funds.

(Id. at 140-141)

Dr. Keyes recommended that plaintiff not work where a high degree interpersonal functioning is required. He found that plaintiff had no impairments in understanding simple instructions, but had a mild impairment in carrying out instructions and performing routine tasks. (Id. at 143) Dr. Keyes also noted a moderate impairment in coping with ordinary work pressures.

On May 28, 2004, Carlene Tucker-Okine, Ph.D., a state agency psychologist, evaluated plaintiff's mental residual functional capacity. (Id. at 144) Dr. Okine concluded that plaintiff had some moderate limitations, is dependent on her mother for directions, but plaintiff could handle repetitive tasks. (Id. at 146) Pedro M. Ferriera, Ph.D., a state agency psychologist affirmed Dr. Okine's assessment. (Id. at 180, 192)

One of the three jobs that plaintiff had after finishing high school was as receptionist/clerk at BayBees Pediatrics. The office manager submitted a letter dated January 20, 2004, wherein she wrote:

> [Plaintiff's] strength's are considerable. She is a willing worker, with a

6

wonderful attitude. She is eager to learn. She is more than willing to help in any task – from straightening up and vacuuming the office, to clearing the ice from the walk in bad weather. [Plaintiff] has a great personality and a wonderful smile that combine to make people feel truly welcomed in our office. She was extremely dependable and was always on time. [Plaintiff] did an extremely thorough job on our patient files-filed accurately, checked the sheets for physician signatures, updated the summary sheets as well. I think this is because on each of these tasks she could work in a scheduled area away from interruption, and focus on her tasks at her own pace, which was at times slower than at other times.
I tried to spend extra time with [plaintiff], explaining each task and the reason the tasks were necessary for the function of the office so she could see that her role was an important one, but even with extra coaching her results were inconsistent. Some days she would do well, on others she would not, and when asked to correct her mistakes, would say something to the effect that this was the first time she knew she was supposed to do a certain task. While it was at times frustrating for me and for others who worked with her, because we knew that we had gone over this information with her numerous times, I truly believe she did not remember. There was no guile in [plaintiff], if she knew something she would say it; if she didn't, she would say it. There is no doubt in my mind that she has a problem retaining information and consistently accessing it when needed. It's sort of like spark plugs on an engine that occasionally misfires, so that the engine underperforms. On some days [plaintiff] would be able to perform all tasks well, but on others it was as if she was operating under a different set of thoughts. And each time she would be confronted with a mistake she had made, I would see her face fall, observe her go more inside of herself, stare into space, and verbally put herself down. This is not meant to be a diagnosis of any sort; I am just trying to describe the kind of inconsistency in her job performance that we encountered.
[Plaintiff] also lacks the interpersonal skills and discretion necessary to interact in a close environment.

(Id. at 62-63)

**B. Testimony**

### 1. Plaintiff

At the time of the ALJ hearing, plaintiff was twenty years old and testified that she lived at home with her parents. (Id. at 246, 253) Plaintiff graduated from high school and has a driver's license. (Id. at 247) She can read and count money slowly. (Id. at

7

248) She reads the Bible but it not able to understand the content. (Id. at 263) Plaintiff enjoys doing art, painting, drawing, coloring and reading newspaper comics. (Id. at 251, 263) She does not have any friends who visit her at her home. (Id. at 260) She has low self-esteem. (Id. at 259) Plaintiff testified about feeling inadequate because of her inability to do things as well as other people. (Id. at 262) She has difficulty remembering things. (Id. at 263) In school, she received special help and attention from her teachers. (Id. at 264) She took Lexapro for depression, but her mother needed to remind her to take it every day. (Id. at 253) Plaintiff stopped taking the medication because it caused nightmares. (Id. at 252-253)

Plaintiff performs some household chores at the direction and supervision of her mother, Patricia Gilliss. (Id. at 253-254) Although she helps her mother with cooking, plaintiff does not cook independently because she has difficulty reading recipe instructions and forgets when things are cooking on the stove. (Id. at 254-255) She has trouble remembering other things, such as names and instructions. (Id. at 255)

She testified about her employment history - a babysitting job, a cashier at Walmart and a receptionist/clerk at a pediatrician's office. (Id. at 247-249) She had trouble getting along with her coworkers at the pediatrician's office. (Id. at 257) Plaintiff had problems with making change and did not work fast enough as a cashier at Walmart. (Id. at 256) She worked as a babysitter but had problems with the children because she was unable to help them with their homework. (Id. at 256)

At the time of the hearing, plaintiff was volunteering a few hours a day three times a week in a school classroom. (Id. at 260) Plaintiff's sister is the classroom teacher and plaintiff is familiar with the students. She enjoys helping the children. She lays out their

mats after recess, assists in cleaning up, and helps them get their things together at the end of the school day. (Id. at 260, 264) She feels comfortable with these children because she knows them; plaintiff believes she would feel uncomfortable around children she did not know. (Id. at 266) After volunteering at the school, she is exhausted and feels sick to her stomach. (Id. at 261)

### 2. Plaintiff's Mother

Plaintiff's mother, Patricia Gilliss, testified. (Id. at 266) She stated that plaintiff repeated the second grade three times and was 15 years old when she was able to tell time. (Id. at 268 ) Plaintiff suffers from extreme fatigue that is accompanied by nausea and pale skin palette; consequently, plaintiff needs to take several naps throughout the day. (Id. at 267) The medication prescribed to help plaintiff did not work and caused adverse side effects. Mrs. Gilliss believes plaintiff's abilities are decreasing and she is becoming more forgetful over time. (Id. at 269)

Mrs. Gilliss testified that plaintiff experienced problems in each of her prior jobs. Specifically, while working at Walmart as a cashier, plaintiff's register was often "off" and attempts to help plaintiff were unsuccessful. (Id. at 272) Plaintiff was ridiculed at her babysitting job because she was unable to help the children with their homework. (Id. at 273) At the pediatric office, plaintiff kept forgetting her responsibilities and, when she learned that the office was considering letting her go, plaintiff felt stupid and wanted to take her own life. (Id. at 274)

When plaintiff was working, her mother stated that she had problems sleeping at night because she would lie awake staring at the alarm clock. (Id. at 274) Mrs. Gilliss has to remind plaintiff to bathe, wash her hair and tells her what clothing to wear. Mrs.

9

Gilliss wakes plaintiff everyday and, believes that without her help, plaintiff would sleep until two or three in the afternoon. (Id. at 278) Without her help, Mrs. Gilliss believes plaintiff would not be able to function. (Id.) Mrs. Gilliss must Plaintiff is able to volunteer at her sister's classroom because her sister is able to communicate with her and the students are familiar to plaintiff. After helping in the classroom for a few hours, plaintiff is exhausted and must lie down for a two-hour nap. (Id. at 278)

### 3. Vocational Expert

A vocational expert ("VE") named Mindy Lubeck testified at the hearing. The VE testified that plaintiff's past work experience was light and semi-skilled. (Id. at 279) The ALJ and VE had the following exchange:

> ALJ: Now, in working with people that have mental problems like a learning disorder or maybe borderline intellectual functional depression what sort of vocational factors might you consider relevant in trying to place people like that?
> VE: Well, some factors that I would consider relevant would be that the work be, you know, simple repetitive. There would -- I would think not -- work that wouldn't require a lot of changes in it that – I guess with regard to a learning disability if there's no or limited reading you would want work that doesn't require, you know, written instructions or record keeping.
> ALJ: What kind of jobs might fit this profile?
> VE: Well, the types of work I think that would fit these types of limitations that are to be associated with learning disability or borderline IQ, you know, something that you could do over and over the same type of thing. Like one type of job might be like a housekeeping cleaner, someone who might let's say clean offices or something like that that, you know, you just do the same thing over and over. You don't need to do much reading and writing. You don't have to interact with the public. . .
>     \*    \*    \*
> ALJ: Okay. We'll go into a hypothetical individual. If we have a hypothetical individual who is a younger individual with a high school education and prior work history similar to that of [plaintiff] and this hypothetical individual has all of the symptoms and limitations that the testimony here today reflected, could you identify any jobs such a hypothetical individual might be able to do?
> VE: I don't think I could. First of all, I think the requirement for napping throughout the day – the fatigue in and of itself I think would preclude a full-

time job. The other aspects of the testimony might be the inability to socialize or relate to people outside of the immediate family or a small familiar group of people would also be a problem in terms of maintaining a full-time competitive job.

(Id. at 279-282) The ALJ then asked the VE to review a paragraph in a exhibit 4F, which provides:

> . . .would do best in work involving primarily routine/repetitive tasks. Working involving a high degree of interpersonal functioning and independent decision-making is problematic. [Plaintiff] is capable of performing self-care skills and activities of daily living, but is dependent on her mother for direction. Thinking is organized, with low average abstract skills.

(Id. at 282) Their exchange continued:

> ALJ: . . .If we have a hypothetical individual with a similar vocational profile as [plaintiff] in terms of age, education, prior work and this hypothetical individual had those limitations, could she do the work that you described previously as far as, you know, cleaning, packaging, and the cafeteria attendant?
> VE: I would think so. I mean I think that those jobs that I indicated, the house-keeping, packing, and cafeteria attendant, would fit --
> ALJ: Within the –
> VE: – in terms of being routine repetitive work not involving a high degree of interpersonal functioning. I feel those jobs would be within -
> ALJ: And in your –
> VE: –those limitations.

(Id.) Plaintiff's counsel then continued the examination of the VE:

> ATTY:. . .In the last hypothetical that you were answering for the [ALJ] and you reviewed a paragraph from Dr. Keyes report [exhibit 4F] – and I'm assuming of course that you read the whole paragraph – he says in the paragraph in the – actually it's the next to last two lines. Let me read it. It says, "[Plaintiff] is capable of performing self-care skills and activities of daily living but is dependent on her mother for direction." In determining that she could do the jobs you suggested just how dependent did you determine that [plaintiff] would be on her mother for direction?
> VE: Well, I read that as far as activities of daily living the dependence for direction at home. I mean if that same need for direction was evident in a work environment – if someone can't function independently, as I said before, outside of their own family or, you know, a small, you know circle, let's say if they couldn't function with strangers when I think it would be work preclusive.

11

(Id. at 283)

## IV. STANDARD OF REVIEW

Findings of fact made by the Commissioner are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. Monsour Medical Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. See id. In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. See id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 555 (1988). The Supreme Court has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Fed. R. Civ. P. 56:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
> Petitioners suggest, as we agree, that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict

12

should not be directed.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g),

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion.

Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the Commissioner "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990).

## V. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), as amended, "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." Bowen v. Yuckert, 482 U.S. 137, 140 (1987). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

13

In <u>Plummer v. Apfel</u>, 186 F.3d 422 (3d Cir. 1999), the Third Circuit outlined the applicable statutory and regulatory process for determining whether a disability exists:

> In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is no only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."
>
> The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a claimant is under a disability. In step one, the Commissioner must determine whether the claimant is currently engaging in substantial activity, the disability claim will be denied. In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work.
>
> If the claimant is unable to resume her former occupation, the evaluation moves to the final step. at this step, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.

Id. at 427-28 (internal citations omitted). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. See 20 CFR § 404.1520(a).

### B. Whether the ALJ's Decision is Supported by Substantial Evidence

By her motion, plaintiff contends that the ALJ's determination is flawed because the hypothetical question relied on by the ALJ to conclude that plaintiff was capable of working pertained to an individual with a learning disability, but was not specific to plaintiff and it failed to include the non-exertional limitations found to exist by the ALJ. Although the ALJ found that plaintiff was "limited to slow paced, non-stressful work, with no public contact," he did not include these limitations in the hypothetical question he used to find plaintiff was not disabled. Plaintiff submits that, had the ALJ formulated a hypothetical specific to plaintiff, he would have learned that there are no such jobs in the economy for said persons. Furthermore, the hypothetical questions were further flawed because the ALJ did not include nor explain the reason for not including the testimony of plaintiff and her mother in the hypothetical question.

Defendant responds that the ALJ's questions were "general in nature" yet urges the court to reject this "form over substance argument" because the VE's testimony "crystalized the functional limitations of plaintiff in a manner wholly consistent with the RFC determination made by the ALJ." (D.I. 15 at 12) Moreover, defendant submits that the ALJ adequately assessed the testimony of plaintiff and her mother against his reasonable interpretation of the evidence of record. The ALJ's credibility determinations should not be disturbed.

15

The record reflects that, in response to the ALJ's request to consider all of the limitations in the record (including those who testified at the hearing), the VE stated that there would be no work that plaintiff could perform. (D.I. 9 at 281-281) For an unspecified reason, the ALJ continued with the same line of questioning, asking the VE to consider a specific part of a report submitted by Dr. Keyes. The ALJ then posed an additional hypothetical question,to which the VE changed her response to indicate that plaintiff was capable of working. This hypothetical question, however, did not include non-exertional limitations found to exist by the ALJ nor did it explain the reasons that plaintiff and her mother's testimony was not referenced at all.[5]

According to the Third Circuit, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). The appellant in Chrupcala "argue[d] that the vocational expert's opinion [that he was able to perform certain jobs] was deficient because it failed to take into account all of appellant's impairments." The court agreed, finding that "[t]he hypothetical question that the ALJ posed did not reflect the fact of constant and severe pain which appellant testified to and which . . . was supported by objective medical findings in the record." Id. In 2005, the Third Circuit clarified that the Chrupcala line of cases

> do[es] not require an ALJ to submit to the vocational expert every impairment **alleged** by a claimant. Instead[,] . . . the hypothetical posed must "accurately portray" the claimant's impairments and

---

[5]The ALJ found that plaintiff was "limited to slow paced, non-stressful work, with no public contact." (D.I. 9 at 16)

16

> . . . the expert must be given an opportunity to evaluate those impairments "as contained in the record." . . . Fairly understood, such references to **all** impairments encompass only those that are medically established . . . . And that in turn means that the ALJ must accurately convey to the vocational expert all of a claimant's **credibly established limitations.**

Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original) (internal citations and footnotes omitted).

The exchange between the ALJ and the VE is notable by the absence of references to plaintiff and her mother's testimony. Instead, the ALJ directed the VE to focus on a specific passage (adverse to plaintiff) from Dr. Keyes' report and formulated a hypothetical that did not include all of plaintiff's credibly established limitations. If the ALJ doubted the testimony of plaintiff and her mother,[6] the justifications for such a conclusion are absent from the record. Considering the record in light of the above authority, the court finds that the ALJ's hypothetical questions were flawed and that remand is appropriate.

## VI. CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment is granted to the extent that the case is remanded for further proceedings. Defendant's motion for summary judgment is denied. An appropriate order shall issue.

---

[6]The testimony of plaintiff and her mother is consistent with much of the evidence of record, particularly the letter submitted by plaintiff's former employer and her school and medical records; the ALJ, however, found the report of Dr. Keyes more compelling. (D.I. 9 at 62-63, 130-133, 140-141, 164-170, 194)

17